The document below is hereby signed.

Signed: December 11, 2014



_S. Martin Teel Jr._____
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| STEPHEN THOMAS YELVERTON, | ) | Case No. 09-00414 |
| | ) | (Chapter 7) |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| STEPHEN THOMAS YELVERTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. |
| | ) | 14-10024 |
| DEBORAH MARM and PHYLLIS | ) | |
| EDMUNDSON, | ) | **Not for publication in** |
| | ) | **West's Bankruptcy Reporter.** |
| Defendants. | ) | |

<u>MEMORANDUM DECISION RE MOTION TO DISMISS</u>

The plaintiff, Stephen Thomas Yelverton, is the debtor in

the main bankruptcy case within which he pursues this adversary

proceeding against his sisters, Deborah Marm and Phyllis

Edmundson.  Yelverton commenced his bankruptcy case under Chapter

11 of the Bankruptcy Code (11 U.S.C.) in 2009.  Later in 2009,

Yelverton brought a lawsuit in North Carolina against Marm and Edmundson, asserting various business law and tort causes of action.  In 2010, the court converted Yelverton's case from chapter 11 to chapter 7, and Wendell W. Webster became the chapter 7 trustee and, as such, the representative of the estate and the substituted plaintiff in the North Carolina law suit. Marm and Edmundson negotiated with Webster, and settled the litigation in 2012 by agreeing to pay the estate $110,000.  In return, the trustee agreed to a global release of the estate's claims against them and to a release of any ownership interest of Yelverton in the closely-held family business.  The settlement was approved by the court after a full-day evidentiary hearing.

Since then, in numerous and frivolous ways, both direct and indirect, Yelverton has unsuccessfully attacked the approval of the settlement.  Notably, in a related adversary proceeding (already dismissed), Yelverton collaterally attacked the settlement by suing Webster and making unsupported allegations that Webster colluded with Marm and Edmundson's counsel during settlement negotiations in order to devalue the estate's assets for the benefit of Marm and Edmundson.  In this proceeding, Yelverton again collaterally attacks the settlement process, this time by claiming that Marm and Edmundson violated the automatic stay of 11 U.S.C. § 362(a) and the Racketeer Influenced and Corrupt Organizations Act (RICO) by conspiring with Webster to

2

devalue the estate's assets for their own benefit and to facilitate their control of estate property.  In fact, they merely defended against his North Carolina lawsuit, filing an answer and a motion to dismiss, and engaged in settlement negotiations with the chapter 7 trustee.

In short, the amended complaint must be dismissed because (1) Yelverton does not have standing to seek the monetary damages he claims; (2) the amended complaint fails to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure for it fails to include well-pled facts supporting the claims asserted, and it is not plausible on its face; (3) it fails to plead special matters with the requisite particularity under Rule 9(b) of the Federal Rules of Civil Procedure; and (4) Yelverton is barred from litigating his claims against his sisters by the doctrines of release, *res judicata* (claim preclusion), and collateral estoppel (issue preclusion).

I

The following facts are a matter of record in the bankruptcy court or are gleaned from the amended complaint (whose well-pled facts must be treated as true in addressing a motion under Rule 12(b)(6)).

In 2008, prior to the filing of the petition commencing the bankruptcy case, a dispute arose between Yelverton and his

3

sisters, Marm and Edmundson, about the management of the family "pig finishing" business, Yelverton Farms, Ltd. (a North Carolina closely-held corporation). Am. Compl. ¶¶ 34, 41, 44, 46-48. The business is located on land owned by Edmundson. Am. Compl. ¶¶ 149, 166. Marm and Edmundson, as controlling directors of the business, removed Yelverton as an officer and director, disputed his ownership of certain 1,333.3 shares of stock, and have refused to relinquish physical possession of the certificates for the disputed stock shares. Am. Compl. ¶¶ 44, 47.

On May 14, 2009, Yelverton commenced his bankruptcy case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code. During the time the case was pending as a chapter 11 case, Yelverton was a debtor in possession under 11 U.S.C. § 1101(1). As such, 11 U.S.C. § 1107(a) authorized him to exercise certain powers of a trustee, including the power under 11 U.S.C. § 323(b) to sue on behalf of the estate.

Yelverton exercised that power on July 29, 2009, by commencing a civil action against Marm and Edmundson in Case No. 5:09-cv-331, before the U.S. District Court for the Eastern District of North Carolina, wherein he "alleged state law claims for the refusal of Marm and Edmundson to allow him to be paid profits from the corporation and to be paid land rents, which totaled at least $75,000," and "alleged Tort claims against them for misappropriating his property [namely, his interest in the

4

family pig farm] and for malicious interference with his business
relations, and demanded damages of up to $3 Million" and included
claims "where Marm and Edmundson would be required to buy
Yelverton's stock interest" under state receivership statutes.
Am. Compl. ¶¶ 52-55.

A few months later, Yelverton filed adversary proceeding
10-10003 against his sisters seeking the turnover of his shares
of stock and an accounting.  Am. Compl., p. 4.  Because of the
overlap with the North Carolina litigation, the bankruptcy court
stayed the proceeding pending the outcome in North Carolina.  Am.
Compl., p. 5.

On August 20, 2010, pursuant to a motion filed by the United
States Trustee, the bankruptcy court converted Yelverton's
bankruptcy case to one under chapter 7 of the Bankruptcy Code.
Am. Compl. ¶ 74.  Webster became the trustee of the bankruptcy
estate, and Yelverton ceased to serve as a debtor in possession.[1]
Webster was substituted as the plaintiff in the North Carolina

---

[1]  Webster is a member of the panel of chapter 7 trustees in
this district under 28 U.S.C. § 586(a)(1).  After another member
of the panel of Chapter 7 trustees had been appointed interim
trustee, but withdrew from serving as the interim trustee, the
United States Trustee appointed Webster the interim chapter 7
trustee on September 9, 2010.  When no one called for an election
of a trustee at the meeting of creditors, Webster became a
trustee no longer serving as such on an interim basis.  See 11
U.S.C. §§ 701(a)(1) and 702(b) and (d).  Webster, as trustee,
became the representative of the estate under 11 U.S.C. § 323(a),
displacing Yelverton as the representative of the estate in the
civil action in the Eastern District of North Carolina.

litigation.

After Webster's appointment and by May 2011, Webster (on behalf of the estate) and Jeffery L. Tarkenton (counsel for Marm and Edmundson and their spouses) started negotiating a global settlement of the estate's claims against Marm and Edmundson. Am. Compl. ¶¶ 78, 149. The negotiations continued until an agreement was signed on March 25, 2012. Am. Compl. ¶ 80. On May 4, 2012, Webster filed in the main bankruptcy case a motion for approval of the settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

On June 18, 2012, the bankruptcy court held a full-day evidentiary hearing on Webster's motion, and Webster testified under direct and cross examination. Yelverton alone cross examined Webster for more than two hours and gave lengthy opening and closing statements. He closely questioned Webster regarding the parties' claims and defenses, the parties' actions in negotiating the settlement, and the valuation of the business and his shares. *See generally* June 18, 2012, Hearing Transcript (Dkt. No. 546 in Case No. 09-00414) (hereinafter "Hearing Tr.") at 53-179. The bankruptcy court rendered findings of fact and conclusions of law from the bench in a 42-minute-long decision, ruling that the settlement should be approved. The court summarized the standard for approving a settlement:

> A bankruptcy court's decision to approve a settlement
> must be an informed one based upon an objective

6

evaluation of developed facts. Indeed, a bankruptcy judge
cannot accept the proponent's word that the settlement is
reasonable, nor may the judge merely rubber stamp a
proposal. . . . Rather, a bankruptcy judge must determine
that a proposed compromise . . . is fair and equitable.
In determining whether a settlement is fair and
equitable, the bankruptcy court should consider:  (1)
probability of success in the litigation;  (2)
difficulties, if any, with collection, (3) the complexity
of the litigation, including the expense, inconvenience
and delay attendant to the litigation; and (4) the
interest of creditors.  The experience and knowledge of
the bankruptcy court judge is of significance in
assessing the propriety of the settlement.  In
determining the reasonableness of a settlement, a
bankruptcy judge must decide only whether the settlement
falls between the lowest and highest points in the range
of reasonableness.

Hearing Tr. at 214-16 (internal quotation marks omitted) (citing

*In re Andre Chreky, Inc.*, 448 B.R. 596, 609 (D.D.C. 2011);

*Advantage Healthplan, Inc. v. Potter*, 391 B.R. 521, 554 (D.D.C.

2008); *Protective Comm. for Indep. Stockholders of TMT Trailer

Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re W.T.

Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)).

At the hearing, the court stated:

So I think that not approving the settlement would add to
the expense and the delay attendant to the litigation,
and it would be inconvenient to proceed to actual
litigation instead of proceeding to a settlement that I
think is well-grounded and [a result of] sound business
judgment.

The trustee testified at length and discussed his
inquiries of Mr. Yelverton regarding the contentions in
the litigation, the defenses that were being raised, and
showed, I thought, an extensive knowledge of what the
issues were. And showed a substantial diligence on his
part in digging into the various pleadings that were
filed, various motions that were filed.  He reviewed the
case law that was submitted by Mr. Yelverton to him

7

incident to reviewing the litigation.  Also the statutory
provisions that Mr. Yelverton provided.    And I'm
convince[d] that the trustee did give very careful
thought to the likely outcome of a litigation and its
expense and reasonably relied upon the advice of his
counsel that other than the ownership interest in
Yelverton Farms, these other claims were not nearly as
valuable in terms of trying to negotiate a settlement.

The motion is approved. The settlement is in the interest
of creditors.  And when I include creditors, I include
the debtor as a residuary entity entitled to whatever
could be obtained if enough were received to pay
creditors in full and something left over for the debtor.
I think he recognizes that that never would happen and
that the reason that he's objecting to the settlement is
because he wants to minimize how much he has left over to
pay nondischargeable debts.   This settlement falls
readily between the lowest and highest points in the
range of reasonableness.  I am convinced the trustee has
used sound business judgment in trying to arrive at this
settlement and avoid the expenses of litigation and bring
this matter to a close so that creditors can receive some
distribution.   The motion is approved.

Hearing Tr. at 218, 227-28, 230-31.  On June 19, 2012, the clerk

entered the bankruptcy court's order approving the settlement

agreement (Dkt. No. 477).[2]

On June 16, 2014, Yelverton filed his complaint in the instant action against his sisters, seeking monetary damages and claiming that they had violated the automatic stay in the main bankruptcy case, resulting in an inappropriately low settlement and thereby causing him injury.  He then amended his complaint to bring claims against them under the Racketeer Influenced and Corrupt Organizations Act (RICO).

II

Yelverton seeks not the mere right to object to the settlement (which objection the court has already heard and rejected on the merits), but monetary damages because of Marm and Edmundson's alleged violations of the automatic stay and RICO.

_____

[2]  Yelverton pursued appeals of that order and of orders rejecting Yelverton's plethora of efforts seeking, directly or indirectly, to undo the order approving the settlement. Specifically, Yelverton took appeals to the district court from the following:  *Order Granting Motion to Approve Settlement Agreement* (Dkt. No. 477); *Order Denying Amended Motion to Compel Trustee to Abandon Litigation Claims* (Dkt. No. 505); *Order Denying Motion to Vacate Order Approving Settlement* (Dkt. No. 507); *Memorandum Decision and Order Denying Motion to Alter or Amend Decision* (Dkt. No. 597) (rejecting Yelverton's attempt to claim that the litigation claims were exempted from the estate under 11 U.S.C. § 522); *Order Denying Second Motion to Vacate Order Approving Settlement* (Dkt. No. 682); *Order Denying Motion to Vacate Order Denying Motion for Relief from Judgment* (Dkt. No. 696); and *Order Denying Motion to Vacate Memorandum Decision* (Dkt. No. 704).  On August 6, 2014, the district court issued a decision and orders in the appeals, Civil Action Nos. 12-01539 and 13-00454, affirming all of those orders.  The decision is reported as *Yelverton v. Webster (In re Yelverton)*, --- B.R. ---, 2014 WL 3849634 (Aug. 6, 2014).

As a threshold matter, the court must determine whether Yelverton has standing to claim such monetary damages.  He does not.

Section 362(k) (11 U.S.C.) provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  This essentially creates a private right of action for automatic stay violations.  RICO also provides for a private right of action.  However, as noted in *Moses v. Howard University Hospital*, 606 F.3d 789, 794-95 (D.C. Cir. 2010),

> even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, [the Supreme] Court has held that the plaintiff generally must assert his own legal rights and interest, and cannot rest his claim to relief on the legal rights or interest of third parties.

(citing *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *see also Powers v. Ohio*, 499 U.S. 400, 409 (1991).  Here, the injury arising from the conduct of which Yelverton complains was to the estate and only derivatively caused harm to Yelverton.  Under *Moses*, and other decisions, merely derivative harm does not suffice to confer standing on Yelverton to sue on claims that belong to the estate.  *See, e.g., Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc.*, 140 F.3d 898, 908 (11th Cir. 1998) ("A creditor will [not] have RICO standing . . . if the injury alleged was suffered only as a result of harm to the corporation.); *Estate of Spirtos v. Superior Court Case*, 443 F.3d

10

1172, 1175-76 (9th Cir. 2006) (holding that a creditor's RICO
claims, alleging injury to her because the trustee conspired to
conceal estate assets, were derivative of the estate and that the
creditor thus did not have standing); *Eakin v. Goffe, Inc. (In re
110 Beaver St. P'ship)*, 355 Fed. Appx. 432, 438-39, 2009 WL
4874783 (1st Cir. 2009) (affirming the dismissal of an adversary
proceeding brought by the partners of the debtor partnership,
alleging violations of the automatic stay, because the injury was
to the debtor's estate and the estate's claims were encompassed
by a settlement agreement with the trustee).

    In his amended complaint, Yelverton alleges that his sisters
violated the automatic stay and RICO by "looting" the estate
through a settlement that fraudulently undervalued estate
property, resulting in less money in the estate and, by
extension, which could result in a lesser dividend to holders of
nondischarged claims that might otherwise occur.  Such
allegations demonstrate that the complained-of injury was
inflicted directly on the estate, not him.  The injury alleged by
Yelverton was suffered only as a result of an alleged injury to
the estate, and the monetary damages he seeks belong to the
estate because they are based on acts allegedly causing harm to
the estate.  Thus, any harm suffered by him is purely derivative

and insufficient to confer standing on him.[3]  In a sense,
therefore, the injury he suffers is not the result of Marm and
Edmundson's alleged acts but rather the result of the appointment
of the chapter 7 trustee, which divested Yelverton of dominion
over estate property and of authority to settle (or not settle)
the lawsuit against his sisters.  No matter the level of
Yelverton's dissatisfaction, he, as a chapter 7 debtor, simply
has no right under the statutory scheme to exercise control over
the estate or sue for alleged harms to the estate.  *See Cook v.
Wells Fargo Bank, N.A.*, Nos. NM-11-082 & 04-17704, 2012 WL
1356490 (10th Cir. BAP Apr. 19, 2012); *Wells Fargo Bank, N.A. v.
Jimenez*, 406 B.R. 935 (D.N.M. 2008).

Yelverton cites to *McGuirl v. White*, 86 F.3d 1232 (D.C. Cir.
1996), for the proposition that his alleged injury confers
standing to sue, but *McGuirl* dealt with the wholly different
issue of whether a debtor has standing to be heard regarding

---

[3] The derivative character of Yelverton's injury is made
even plainer when one plots out the chain of events had the
alleged injury not occurred.  As he alleges, Marm and Edmundson's
activities resulted in a lower valuation of estate property (the
stock shares) and a lower negotiated settlement to be paid by the
sisters to the estate.  If his sisters had not committed the
alleged wrongful actions, the benefit would have inured first to
the estate, with a higher settlement paid by the sisters,
resulting in increased estate funds.  Those funds would then be
available to pay administrative expenses and creditors.  If there
were any funds left over after paying administrative expenses,
some of the creditors holding nondischarged claims might receive
disbursement and thus Yelverton's personal liability might be
reduced by that unknown amount.

12

whether the court should approve relief sought in the bankruptcy case that would have an adverse impact upon the debtor.  In *McGuirl*, the debtors sought to contest the reasonableness of the chapter 7 trustee's attorneys' application for administrative expenses because a grant of the application would reduce the amount of money available to pay the debtors' nondischarged debts.  Under 11 U.S.C. § 330(a)(1), such fee applications can be approved only "after notice to the parties in interest," and the court found that, like creditors, the debtors had standing to object to the application because they would be directly affected by the fee award: every dollar of the fee application disallowed would reduce by a dollar the nondischarged debts the debtors would owe after the bankruptcy case.

Similarly in Yelverton's bankruptcy case, Rule 9019 of the Federal Rules of Bankruptcy Procedure accorded Yelverton the right to notice of the hearing on the motion to approve the settlement between the trustee and Marm and Edmundson.  Under *McGuirl*, Yelverton had standing to object to the motion to approve the settlement.  This court gave Yelverton full rein to participate in the hearing on that motion, and Yelverton unsuccessfully sought to set aside the order approving the settlement pursuant to motions under Rules 59 and 60 of the Federal Rule of Civil Procedure (made applicable by Rules 9023 and 9024 of the Federal Rules of Bankruptcy Procedure), and

13

pursuant to an appeal to the District Court.

Now, however, Yelverton seeks to sue Marm and Edmundson for alleged wrongs they inflicted upon the estate. The Bankruptcy Code contains no provision conferring upon a debtor the right to sue for injury to the bankruptcy estate that derivatively causes harm to the debtor. The exclusive right to sue for injuries to the estate rests in Webster as the representative of the estate under 11 U.S.C. § 323(a), and Yelverton thus lacks standing to sue. *See Moses*, 606 F.3d at 795; *Estate of Spirtos*, 443 F.3d at 1175-76. The *McGuirl* court did not hold that a debtor's nondischargeable debts confer standing on that debtor to seek monetary damages for injury inflicted upon the bankruptcy estate. *McGuirl* offers no basis for Yelverton to pursue claims for monetary damages that belong to the estate.

The third-party standing doctrine (that an entity may not assert a statutory claim when the injury was to the estate and only derivatively caused harm to the entity) is a recognition that the statute was not intended to confer a right to sue for monetary damages when the entity has suffered only derivative injury. In those circumstances, the entity is not with the "zone of interests" the statute is intended to protect: Congress could not have intended that both the estate (the directly injured party) and the entity suffering merely derivative injury are entitled to sue under the statute for the same injury. *See*

14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.

Ct. 1377, 1388-89 (2014).  Stated another way, the amended

complaint must be dismissed because:

> the proximate-cause requirement generally bars suits for
> alleged harm that is "too remote" from the defendant's
> unlawful conduct.  That is ordinarily the case if the
> harm is purely derivative of "misfortunes visited upon a
> third person by the defendant's acts."

*Lexmark*, 134 S. Ct. at 1390-91 (citing *Holmes v. Sec. Investor*

*Prot. Corp.*, 503 U.S. 258, 268-69 (1992)).

Ultimately it does not matter whether the question of

Yelverton's standing ought to be analyzed based on limitations on

third-party standing (*see Lexmark*, 503 U.S. at 1387 n.3), the

failure of Yelverton to fall within the "zone of interests" (*see*

*Lexmark*, 503 U.S. at 1388-90), or lack of proximate causation

(*see Lexmark*, 503 U.S. at 1390-91).  Under each of these

doctrines, Yelverton has no right to sue.

### III

Even if Yelverton had standing to seek monetary damages, his

claims for violations of the automatic stay must be dismissed

because he has failed to state a claim upon which relief can be

granted under the pleading standards of *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007) (a complaint must plead "enough

facts to state a claim to relief that is plausible on its face");

and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (a complaint

fails "if it tenders naked assertions devoid of further factual

enhancements").

A.

Yelverton lists his "causes of action for violation of the automatic stay" in paragraph 178(a)-(g) of the amended complaint. First, he claims that his sisters violated the stay

> under 11 U.S.C. 362(a)(1) [by] commencing and continuing
> their pre-Petition claims against the Debtor after May
> 14, 2009, with respect to his role in Yelverton Farms,
> Ltd., prior to May 14, 2009, by pursuing their claims
> against the Debtor after August 20, 2010, and prior to
> December 3, 2010, for ownership of his pre-Petition
> property, in Settlement negotiations with the Chapter 7
> Trustee, where Marm and Edmundson had actual knowledge of
> the Automatic Stay, declined to seek relief from the
> Stay, and declined to file a Proof of Claim against the
> Debtor in the Bankruptcy Court.

Am. Compl. ¶ 178(a).  Essentially, this cause of action asserts that the defendants violated the automatic stay by "pursuing their claims" by engaging in settlement negotiations with Webster, the chapter 7 trustee, to resolve a lawsuit brought by the debtor against the defendants.  This allegation fails to state a claim for which relief can be granted.

Section 362(a)(1) (11 U.S.C.) provides that the bankruptcy petition

> operates as a stay, applicable to all entities, of . . .
> the commencement or continuation .  .  . of a judicial,
> administrative, or other action or proceeding against the
> debtor that was or could have been commenced before the
> commencement of the case under this title, or to recover
> a claim against the debtor that arose before the
> commencement of the case under this title . . . .

The stay applies, by the explicit terms of the statute, only to

16

actions *against* the debtor; it "does not address actions brought by the debtor which would inure to the benefit of the bankruptcy estate." *Carley Capital Group v. Fireman's Fund Ins. Co.*, 889 F.2d 1126, 1127 (D.C. Cir. 1989) (citing *Ass'n of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982)).   There is "no policy of preventing persons whom the bankrupt has sued from protecting their legal rights."   *Wash. Mut., Inc. v. Fed. Deposit Ins. Corp.*, 659 F. Supp. 2d 152, 155 (D.D.C. 2009) (citing *Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n*, 892 F.2d 575, 577 (7th Cir. 1989)).   Indeed,

> Fulfillment of [the stay's] purpose cannot require that every party who acts in resistance to the debtor's view of its rights violates § 362(a) if found in error by the bankruptcy court.  Thus, someone defending a suit brought by the debtor does *not* risk violation of [the automatic stay] by filing a motion to dismiss the suit, though his resistance may burden rights asserted by the bankrupt.

*United States v. Inslaw, Inc.*, 932 F.2d 1467, 1473 (D.C. Cir. 1991) (emphasis in the original) (citing *Martin-Trigona*, 892 F.2d at 577).

Here, the lawsuit underlying the complained-of settlement negotiations was brought *by* the debtor, not against him.  During the negotiations, the defendants would necessarily have advanced arguments to obtain settlement terms more favorable to them. This, however, is not a violation of the automatic stay, even if the settlement's benefit to the estate (the $110,000 sum that the defendants agreed to pay the estate) is theoretically less than

17

it could have been had the defendants simply and wholly
capitulated to all the lawsuit's demands.

Moreover, the stay cannot operate to bar actions
specifically authorized by other provisions of the Bankruptcy
Code.  Section 704(a)(1) (11 U.S.C.) authorizes and requires the
trustee to "collect and reduce to money the property of the
estate."  In this case, the trustee reduced Yelverton's North
Carolina lawsuit and stock (which are property of the estate) to
money by settling the suit for $110,000 from the defendants.  If
the automatic stay operated to bar the defendants from
negotiating such a settlement, the trustee would be hamstrung in
discharging his statutory duties.  Such a result cannot be.  This
allegation, therefore, fails to state a claim for which relief
can be granted.

### B.

Next, Yelverton claims that his sisters violated the stay

> under 11 U.S.C. 362(a)(1) [by] asking Wade H. Atkinson,
> Jr., through their joint counsel, White & Allen, P.A., to
> Intervene in [the North Carolina litigation] in August
> 2009 to implicitly pursue pre-Petition claims against the
> Debtor.

Am. Compl. ¶ 178(b).  He alleges elsewhere that

> The counsel for Marm and Edmundson, White & Allen, P.A.,
> asked its client, Atkinson, to Intervene to be aligned
> with Marm and Edmunson, to make third-party claims
> against Yelverton, where Atkins filed his Pro Se Motion
> for Intervention in August 2009, and made implicit
> demands and claims against Yelverton for re-payment of
> his pre-petition loan of $360,000. . . . At a Hearing on
> February 25, 2010, the U.S. District Court in North

> Carolina dismissed and terminated Atkinson as a party for
> failure to prosecute his claims under the UCC lien
> against Yelverton.

Am. Compl. ¶¶ 58, 62.  This allegation fails to state a claim for
which relief can be granted.

Yelverton alleges in his amended complaint that, in 2007, he
pledged his stock shares to Atkinson as collateral for a loan.
Am. Compl. ¶ 37.  In 2008, Yelverton "stated his intention to
assign" his shares to Atkinson but "rescinded his intention" the
following year.  Am. Compl. ¶¶ 40, 49.  Atkinson's status as a
possible assignee or owner figured prominently in the dispute
between Yelverton and his sisters over the ownership of
Yelverton's shares.  Am. Compl. ¶¶ 41, 44-47.  Plainly,
Yelverton's North Carolina lawsuit against his sisters, which
included claims "where Marm and Edmundson would be required to
buy Yelverton's stock interest," implicated possible interests of
Atkinson.  Yelverton's allegation that his sisters invited
Atkinson to join the litigation to "implicitly" pursue claims
against him implies that they did not invite him to explicitly
make claims against the debtor – in other words, logically,
Yelverton has alleged that his sisters invited Atkinson to join
them as defendants without explicit counterclaims.

As discussed above in subsection A, the automatic stay does
not prevent an entity from protecting its legal rights from the
litigious aggression of the debtor.  If Yelverton's sisters are

not barred from filing an answer or motion to dismiss in the
North Carolina litigation (which they are not), they certainly
are not barred from suggesting to a third party that that third
party join in the litigation.

Moreover, the interests of justice are more efficiently
served when all parties to a dispute are joined, and thus it is
entirely appropriate for Marm and Edmundson to have notified
Atkinson of the pendency of a lawsuit which possibly implicated
his interests.  It is the responsibility of each litigant to
ensure that its conduct is appropriate; for example, even if
Atkinson had joined the litigation and pursued explicit
counterclaims against Yelverton or had joined as a third-party
plaintiff against Yelverton (which Yelverton has not sufficiently
alleged), it would have been Atkinson's, not the sisters',
responsibility to ensure his activity did not violate the
automatic stay.  Therefore, this claim fails to state a competent
claim against Marm and Edmundson.

C.

Yelverton next alleges that his sisters violated the stay

> under 11 U.S.C. 362(a)(1) and (a)(3) [by] implicitly
> filing counter-claims against the Debtor on March 17,
> 2010, in [the North Carolina litigation], by asserting
> that he is <u>not</u> the owner of any stock in Yelverton Farms,
> Ltd., which is property of the Debtor Estate.

Am. Compl. ¶ 178(c).  Yelverton specifically alleges that:

> On March 17, 2010, White & Allen, P.A., on behalf of Marm
> and Edmundson, filed a Motion to Dismiss Yelverton's

20

> Complaint on the basis that Atkinson is the owner of the
> stock in Yelverton Farms, Ltd., where such implicit
> counter-claim against Yelverton was made with their
> knowledge that Atkinson had <u>never</u> been an owner and which
> shows that they had become the owner and were using
> Atkinson as a cover.

Am. Compl. ¶ 63.  These allegations also fail to state a
competent claim.

As discussed above in subsection A, the automatic stay only
operates on actions against, not by, the debtor.  A motion to
dismiss the debtor's suit does not run afoul of Section 362(a).
*Inslaw,* 932 F.2d at 1473 (citing *Martin-Trigona*, 892 F.2d at
577).  While some jurisdictions have ruled that a counterclaim
may comprise an action "against" a debtor, Yelverton fails to
allege that his sisters actually filed a counterclaim against
him.  His attempts to characterize his sisters' March 17, 2010,
motion to dismiss as an "implicit counterclaim" is a legal
argument unsupported by citation or by any authority of which
this court is aware.  This allegation fails to state a competent
claim.

### D.

Next, he claims that his sisters violated the stay

> by the Chapter 7 Trustee acting in the Debtor's Domestic
> Relations proceeding in September 2012, and after, to
> assert pre-Petition implicit counter-claims against the
> Debtor by agreement with Marm and Edmundson, and by the
> Trustee acting for their benefit for them to continue
> control and ownership of property of the Debtor Estate
> that is included within property subject to the
> jurisdiction of the Domestic Relations Court.

21

Am. Compl. ¶ 178(d).  Yelverton specifically alleges that

> In September 2012, Webster as Chapter 7 Trustee acted in
> Yelverton's Domestic Relations proceeding in the Superior
> Court to prevent his Spouse from taking any Marital
> property, and Webster did so by agreement with Marm and
> Edmundson for them to continue control and ownership of
> property of the Debtor Estate, which includes the 1,333.3
> shares of stock in Yelverton Farms, Ltd., but where
> Yelverton's Spouse has both Marital rights, Common Law
> lien rights, and superior claims as a priority Creditor.

Am. Compl. ¶ 83.  This string of conclusory allegations is

nonsensical.  It fails to state any facts which would support a

claim against Marm and Edmundson.  As the representative of the

estate under 11 U.S.C. § 323(a) and by reason of having the

capacity to sue under 11 U.S.C. § 323(b), Webster was fully

authorized to act to assert the estate's superior interests in

the property of the estate, and to negotiate a settlement

ultimately approved by the court as in the best interest of the

estate.

E.

Yelverton next alleges that Marm and Edmundson violated the

stay

> by taking control of property of the Debtor Estate after
> May 14, 2009, which includes the Debtor's 1,333.3 shares
> of stock in Yelverton Farms., Ltd., and his litigation
> claims against Marm and Edmundson in [the North Carolina
> litigation], where his equity is worth $700,000, or more.

Am. Compl. ¶ 178(e).  It is unclear whether Yelverton is alleging

that his sisters acted "to obtain possession" or "to exercise

control" under 11 U.S.C. § 362(a)(3).  He admits, however, that

22

Marm and Edmundson had physical custody of the stock
certifications for Yelverton's shares at least as early as
November 2007.  Am. Compl. ¶¶ 37-38.  Therefore, his sisters
could not have acted to obtain possession after the petition was
filed since they already had possession prior to the petition's
filing.

As to a claim that they exercised control, Yelverton has
failed to allege facts to support such a claim.  To the extent
that Yelverton is claiming that his sisters' continued possession
of the certificates for the 1,333.3 shares of stock is a
violation of the automatic stay, he still fails to state a
competent claim.

First, he fails to state a competent claim because he has
alleged that the parties were engaged in an ownership dispute
over the shares.  The automatic stay, like the turnover provision
of the Bankruptcy Code, 11 U.S.C. § 542, cannot be used as a
vehicle "to liquidate contract disputes or otherwise demand
assets whose title is in dispute."  *See Inslaw,* 932 F.2d at 1472
(citing turnover cases *In re Charter Co.,* 913 F.2d 1575, 1579
(11th Cir. 1990); *In re Satelco, Inc.,* 58 B.R. 781, 786 (Bankr.
N.D. Tex. 1986); *In re Chick Smith Ford, Inc.,* 46 B.R. 515, 518
(Bankr. M.D. Fla. 1985); *In re FLR Co.,* 58 B.R. 632 (Bankr. W.D.
Pa. 1985)).  Indeed, this court stayed Yelverton's turnover
proceeding against his sisters (Adversary Proceeding no. 10-

23

10003) pending the resolution of the North Carolina litigation
over ownership and management of the family business.  Using
§ 362(a) against property with disputed title would "creat[e] a
kind of universal end-run around the limits on turnover."
*Inslaw*, 932 F.2d at 1473.  It does not violate the automatic stay
when a party retains possession, obtained pre-petition, over
property under a claim of right.  *See Inslaw*, 932 F.2d at 1473.

Second, Yelverton would have failed to state a competent
claim even if he had not alleged that there was an ownership
dispute between him and his sisters.  Even when there is no
colorable claim of right on the part of the entity that has
seized property of the estate prepetition, no violation of the
stay arises from that entity's continued retention of the
property because 11 U.S.C. § 542(a) is not self-executing.  *In re
Hall*, 502 B.R. 650, 669 (Bankr. D.D.C. 2014).

Therefore, Yelverton's allegation fails to state a competent
claim.

F.

Next, he alleges that his sisters violated the stay

by taking for themselves and their family members legal
ownership of the Debtor's 1,333.3 shares of stock in
Yelverton Farms, Ltd., after May 14, 2009.

Am. Compl. ¶ 178(f).  Yelverton's assertion that his sisters
violated the stay by taking legal ownership of his stock is a
legal conclusion; he fails to allege any facts to support this

24

conclusion.  To the extent that he is referring to the settlement

between his sisters and the chapter 7 trustee, whereby the

sisters agreed to pay the estate $110,000 and the trustee agreed

to a termination of any ownership interest of Yelverton, such an

allegation fails to state a competent claim for the reasons

discussed in subsection A, above.

G.

Yelverton next alleges that his sisters violated the stay

> by acting after May 14, 2009, to set-off their debts of
> at least $75,000, owing to the Debtor prior to May 14,
> 2009, against their claims against the Debtor arising
> prior to May 14, 2009.

Am. Compl. ¶ 178(g).  Yelverton's assertion that his sisters

acted to set off a debt of $75,000 is a legal conclusion, and he

fails to allege any facts to support his claim.  The figure of

$75,000 is the same amount that Yelverton claimed in the North

Carolina litigation that his sisters owed him for unpaid profits

from the family business; however, Yelverton fails to allege

facts that would indicate that his sisters set off this alleged

debt in any way.  To the extent that Yelverton's reference to a

set-off is a reference to the settlement negotiations, it fails

to state a competent claim for the reasons discussed in

subsection A, above.

IV

Yelverton's civil RICO claim against his sisters under 18

U.S.C. § 1962(c) and (d) fails, as discussed above in section II,

25

because Yelverton does not have standing.  In addition, this claim fails because Yelverton fails to allege well-pled facts to support each element of his RICO claim under Rule 12(b)(6) and fails to plead special matters (including fraud) with the requisite particularity under Rule 9(b).

Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  Thus, a RICO violation under § 1962(c) consists of four elements:  (1) conducting (2) an enterprise (3) through a pattern (4) of racketeering activity. *Western Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001).  "Racketeering activity" refers to the commission of statutorily-defined predicate criminal acts, including extortion (violation of 18 U.S.C. § 1951); mail fraud (violation of 18 U.S.C. § 1341); wire fraud (violation of 18 U.S.C. § 1343); and certain types of bankruptcy fraud (*see* 18 U.S.C. § 1961(1)(D)).  Conspiracy to violate any subsection of 18 U.S.C. § 1962 is a separate RICO violation under § 1962(d).  In addition, the plaintiff in a civil RICO suit must "show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well."  *Eastern Sav. Bank, FSB v. Papageorge*, --- F. Supp. 2d ----, 2014 WL 910357, at *4

(D.D.C. Mar. 10, 2014) (citing *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010)) (internal quotation marks omitted).

## A.   Racketeering Activity: Predicate Acts

Yelverton lists eight[4] alleged predicate acts in his amended complaint; however, he fails to allege sufficient, particularized facts to support this.  Not one of the alleged acts is a predicate act for purposes of RICO, and Yelverton thus fails to sufficiently allege the element of "racketeering activity," dooming his RICO claim.

### *Predicate Acts 1-4, 8*

As to predicate acts 1-4 and 8, Yelverton alleges that Marm and/or Edmundson committed mail, wire, and/or bankruptcy fraud by making (either directly or through their attorney Tarkenton or through an unnamed third party) the false claim that Atkinson "is or may be" the owner of Yelverton's 1,333.3 shares of stock. This false claim was made to the U.S. Trustee (predicate act 3) and in filings in bankruptcy proceedings (predicate acts 1 and 4) and the North Carolina litigation (predicate acts 2 and 8).

Yelverton's allegations fail to meet the requirements of Rule 12(b)(6) and Rule 9(b).  "The predicate acts of an alleged RICO fraud must be pled with particularity as required under the

---

[4]   Yelverton also avers in paragraph 171 of the amended complaint that the seven alleged violations of the automatic stay are "criminal" and constitute "predicate acts;" however, he fails to plead sufficient facts to support this legal conclusion.

heightened pleading standard of Rule 9(b) of the Federal Rules of
Civil Procedure." *Brink v. XE Holding, LLC*, 910 F. Supp. 2d 242,
255 n.12 (D.D.C. 2012) (citing *Prunte v. Universal Music Grp.*,
484 F. Supp. 2d 32, 42 (D.D.C. 2007)).  This means that Yelverton
must allege with specificity the "who, what, when, where, and
how" related to his mail, wire, and bankruptcy fraud claims:  the
"specific fraudulent statements, who made the statements, what
was said, when or where these statements were made, and how or
why the alleged statements were fraudulent." *Brink*, 910 F. Supp.
2d at 255 n.12.  Moreover,

> RICO claims premised on mail or wire fraud must be
> particularly scrutinized because of the relative ease
> with which a plaintiff may mold a RICO pattern from
> allegations that, upon closer scrutiny, do not support
> it.  This caution stems from the fact that it will be the
> unusual fraud that does not enlist the mails and wires in
> its service at least twice. . . . As a result, a
> plaintiff must plead circumstances of the fraudulent acts
> that form the alleged pattern of racketeering activity
> with sufficient specificity pursuant to Fed. R. Civ. P.
> 9(b).

*Bridges v. Lezell Law, PC*, 842 F. Supp. 2d 261, 265 (D.D.C. 2012)
(citing *Western Assocs.*, 235 F.3d at 637; *Menasco, Inc. v.
Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989)) (internal quotation
marks omitted).  Yelverton fails to do so.  As to predicate acts
1, 2, 3 and 8, the purported false claim was merely that Atkinson
was or may be the owner of the stock; as to predicate act 4, the
false claim was the defendants' attorney's "suggestion" that
Atkinson was the owner.  In light of Yelverton's own allegations

28

in the amended complaint that he pledged his stock shares to
Atkinson and announced to the defendants that he intended to
assign his shares to Atkinson (Am. Compl. ¶¶ 37, 40, 49) and that
Atkinson's status as a possible assignee or owner figured
prominently in the dispute between Yelverton and his sisters over
the ownership of Yelverton's shares (Am. Compl. ¶¶ 41, 44-47),
Yelverton fails to allege fraud, rising to the level of a
predicate criminal act, with particularity when he alleges such
ambiguous statements from the defendants.

In addition, as to predicate act 1, Yelverton does not
identify any specific fraudulent statements or specify when
statements were made; he merely states that "[d]uring the
pendency" of Adversary Proceeding No. 10-10003, the defendants
made "repeated intentional _false_ claims" about Atkinson's
possible ownership of the stock.  Am. Compl. ¶ 137.  As to
predicate act 3, Yelverton does not allege with sufficient
specificity the identity of the person who contacted the U.S.
Trustee about Atkinson's possible ownership; rather, he only
states that "Marm caused to be contacted" the U.S. Trustee and
"caused to be _falsely_ claimed and represented" that Atkinson was
the owner of the stock.  Am. Compl. ¶ 143.  Yelverton thus fails
to properly plead his RICO claims against the defendants as to
these alleged predicate acts.

29

*Predicate Act 5*

Yelverton alleges that the defendants (along with their
attorneys and the chapter 7 trustee) "marred" the value of the
bankruptcy estate by placing a clause in the settlement agreement
(between the defendants and the chapter 7 trustee) that states
that Edmundson would not be renewing the lease of her land to
Yelverton Farms, Ltd., after the expiration of the lease on
December 31, 2013.  Am. Compl. ¶¶ 149-50.  He asserts that this
settlement clause constitutes bankruptcy and wire fraud.  He does
not (and cannot, according to the record in the main bankruptcy
case) allege that Edmundson did not have the right, as the owner
of the land, to decline to renew the farm's lease at the end of
the lease.  He provides no additional facts to support his claim
that Edmundson's refusal to renew was fraudulent.  His
allegations as to this alleged predicate act fail to meet the
requirements of Rule 12(b)(6) and 9(b).

*Predicate Act 6*

Yelverton alleges that the defendants (along with their
attorneys and the chapter 7 trustee) "conspired to cause to be
made" false representations during the settlement approval
hearing on June 18, 2012, regarding the value of Yelverton Farms,
Ltd., and Yelverton's stock, and that this constitutes bankruptcy
fraud.  Am. Compl. ¶ 152.  He claims it also constitutes mail and
wire fraud because his sisters "would have of necessity" sent the

30

valuation information to their attorneys.  Am. Compl. ¶ 154.
These allegations fail to plead fraud with the requisite
particularity.

*Predicate Act 7*

Finally, Yelverton alleges that Webster extorted Yelverton's
ex-wife Senyi to give up "any Marital claim" to the property of
the bankruptcy estate under color of official right by
threatening (via motion filed in the divorce case between
Yelverton and Senyi) prosecution against her for bankruptcy
fraud.  Am. Compl. ¶¶ 155-56.  As a result, on October 1, 2012,
Senyi filed a motion in the divorce matter wherein she "renounced
and waived any Marital claim to property of the Estate."  Am.
Compl. ¶ 157.

Yelverton does not allege how such acts of Webster can
constitute a predicate act of Marm and Edmunson for purposes of a
§ 1962(c) claim.  In addition, Yelverton fails to allege that
Webster obtained the property claim that Senyi gave up.  Section
1951 (18 U.S.C.) defines extortion as "the obtaining of property
from another, with his consent, induced by wrongful use of actual
or threatened force, violence, or fear, or under color of
official right."  The U.S. Supreme Court elaborated, "Obtaining
property requires not only the deprivation but also the
acquisition of property.  That is, it requires that the victim
part with his property, and that the extortionist gain possession

31

of it." *Sekhar v. United States*, 133 S. Ct. 2720, 2725 (2013)

(citing *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393,

403 n.8, 404 (2003); R. Perkins & R. Boyce, *Criminal Law* 451 (3d

ed. 1982)) (internal quotation marks omitted).  Yelverton's

allegations bear resemblance to the *Sekhar* Court's description of

the historic crime of coercion, which required "merely the use of

threats to compel another person to do or to abstain from doing

an act which such other such person has a legal right to do or to

abstain from doing."  133 S. Ct. at 2725 (internal citations

omitted).  Coercion, however, is not equivalent to the statutory

crime of extortion and is not a predicate act for purposes of

RICO.  *Id.*  These allegations fail to plead a predicate act of

extortion.

Therefore, as to all the allegations related to alleged

predicate acts, Yelverton fails to properly plead a predicate act

under RICO.

B.   Pattern

Because Yelverton has failed sufficiently to allege any

predicate acts of racketeering activity, he necessarily fails to

sufficiently allege a pattern of such activity.  Moreover, even

if predicate acts were sufficiently alleged with particularity,

Yelverton would still have failed to sufficiently allege a

"pattern" as required for a cognizable RICO claim.

To show that a pattern exists, RICO requires at least two

predicate acts over a 10-year period which show elements of
relatedness and continuity. *Western Assocs.*, 235 F.3d at 633
(citing 18 U.S.C. § 1961(5); *H.J. Inc. v. Northwestern Bell Tel.
Co.*, 492 U.S. 229, 239 (1989)); *Bridges*, 842 F. Supp. 2d at 264.
Continuity is the more relevant inquiry in this case.   Continuity
may be shown either by a "closed period of repeated conduct" or a
threat of future criminal activity, *Western Assocs.*, 235 F.3d at
633; Yelverton has alleged the former, Am. Compl. ¶ 171.   Thus,
there are six relevant, flexible factors for this court to
consider: "the number of unlawful acts, the length of time over
which the acts were committed, the similarity of the acts, the
number of victims, the number of perpetrators, and the character
of the unlawful activity." *Western Assocs.*, 235 F.3d at 633-34
(quoting *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48
F.3d 1260, 1265 (D.C. Cir. 1995)).   Notably, "if a plaintiff
alleges only a single scheme, a single injury, and few victims it
is virtually impossible for [him] to state a RICO claim."   *Id.*
(dismissing RICO claim where plaintiff alleged single scheme of
fraudulent bookkeeping entries, resulting in single injury to
single set of victims); *see also Busby v. Capital One, N.A.*, 772
F. Supp. 2d 268, 281-282 (D.D.C. 2011) (dismissing RICO claim
where plaintiff's allegations "focus[ed] exclusively on the
actions taken by the defendants to foreclose on the plaintiff's
property" since such "claims relate[d] to a single alleged

33

scheme, for which he was the sole injured party"); *Eastern Sav.*
*Bank*, 2014 WL 910357, at *5 (dismissing the RICO claim where the
plaintiff "only alleged that the defendants engaged in acts
designed to obtain control of the Property from the plaintiff at
a low price, regardless of the amount of time over which those
acts were committed").

Here, Yelverton does exactly that: he alleges a single
scheme (to wrest ownership and control of the family business), a
single injury (the loss of his interest in the family business,
including his stock shares and his related lawsuits), and few
victims (himself and, indirectly, a single set of creditors).
This is insufficient to state a pattern of racketeering;
Yelverton's RICO claim thus fails.

### C.  Enterprise

Yelverton alleges that the "enterprise" here is "the
Bankruptcy Estate, a legal entity."  Am. Compl. ¶ 136.  This
makes no sense.  In order to be a RICO enterprise, the entity or
association in question must be comprised of persons associated
together for a common purpose.  *Feld Entm't, Inc. v. Am. Soc'y*
*for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288,
313-14 (D.D.C. 2012) (citing *United States v. Turkette*, 452 U.S.
576, 583 (1981)).  Here, Yelverton alleges that the defendants'
purpose was to commit fraud and thereby "loot" the bankruptcy
estate; however, such a purpose is not shared by Yelverton's

34

bankruptcy estate itself.  Yelverton filed his bankruptcy case on

his own, and he does not contend he intended the case to be used

as a vehicle to commit fraud.  Presumably, the purpose of

Yelverton's bankruptcy case was the pursuit of a lawful

discharge, a "fresh start" for the debtor – not fraud.  Indeed,

the court would be presented with a strange situation if

Yelverton were alleging for purposes of his RICO claim that the

purpose of his bankruptcy was fraudulent.  Without a common

purpose, shared by his sisters, the bankruptcy estate cannot be

the RICO enterprise for purposes of Yelverton's allegations of

fraud and "looting" of the estate.  Yelverton's failure to

sufficiently allege a RICO enterprise dooms his RICO claim.

Yelverton cites to *Handeen v. Lemaire*, 112 F.3d 1339 (8th

Cir. 1997), to support his designation of his bankruptcy estate

as a RICO enterprise.  The case is not controlling precedent and

is easily distinguishable on its facts.  In that case, the

plaintiff/creditor Handeen alleged that the debtor Lemaire filed

bankruptcy and with the assistance of others committed various

acts of fraud in order to evade a judgment debt held by Handeen:

> The players, who remained constant throughout the
> endeavor, devised a detailed plan to defraud Handeen.
> Lemaire, the primary beneficiary, was required to file a
> bankruptcy petition, make various court appearances, lend
> his signature to documents, and comply with the repayment
> plan. The parents, who made false claims in order to
> deplete estate assets and syphoned money back to Gregory,
> assumed the role of fictitious creditors. The Firm
> directed the affair, representing Lemaire and his
> parents, and took primary responsibility for shepherding

the estate through our often labyrinthine legal system.
*Handeen*, 112 F.3d at 1352.  The bankruptcy itself was fraudulent,
and the debtor and his co-conspirators availed themselves of the
bankruptcy case's structure and procedures as the vehicle for
fraud.  Here, Yelverton has not alleged (and presumably would not
allege) that the bankruptcy filing itself was fraudulent or that
the entire structure of his bankruptcy was a vehicle for fraud.
He has not sufficiently alleged the existence of a RICO
enterprise.

D.  Conspiracy under 18 U.S.C. § 1962(d)

Because Yelverton's RICO claim under § 1962(c) fails to
plead a violation, his RICO conspiracy claim under § 1962(d)
based on the same facts fails as well.  *Bridges*, 842 F. Supp. 2d
at 267 (citing *Edmondson & Gallagher*, 48 F.3d at 1265); *see also
Meier v. Musburger*, 588 F. Supp. 2d 883, 912 (N.D. Ill. 2008)
("Since a pattern of racketeering activity is RICO's key
requirement, an agreement to commit acts that do not constitute a
pattern cannot be an agreement to violate RICO") (internal
citations omitted).

V

In addition to failing the standard set by Rules 12(b)(6)
and 9(b), Yelverton's amended complaint is barred by the
doctrines of release and res judicata (claim preclusion) because
of the existence of a court-approved settlement agreement which

36

encompasses his current claims.

"The finality of court-approved settlements . . . is
important, especially to the efficient administration of the
estate and to reassure settling parties that [the other party]
will not relitigate the settled claims." *Petitioning Creditors of
Melon Produce, Inc. v. Braunstein*, 112 F.3d 1232, 1240 (1st Cir.
1997).  The meaning of a settlement agreement is, as with all
contracts, a question of law; if the settlement agreement is
unambiguous (which Yelverton does not dispute), the
interpretation of the agreement may be resolved at the motion to
dismiss stage.  *See Asarco, LLC v. Union Pac. R.R. Co.*, 765 F.3d
999, 1008-1009 (9th Cir. 2014) (internal citations omitted).  The
settlement agreement provided for a full release of all claims

> by reason of, related to or arising out of any matters
> raised, or which could or might have been raised, in the
> [North Carolina] case, the Bankruptcy Case, the Edmundson
> Case [Adversary Proceeding No. 10-10003] or the Marm Case
> [Adversary Proceeding No. 10-10004] including, but not
> limited to, **all matters arising out of the dispute
> between them related to the ownership interest of Stephen
> Thomas Yelverton in Yelverton Farms**, the division of the
> property formerly owned by John T. Yelverton, deceased,
> father of Stephen Thomas Yelverton, Ms. Edmundson, and
> Ms. Marm, the [North Carolina] case and the Bankruptcy
> Case.  It is specifically  understood and agreed that
> this Settlement Agreement is intended to be a full and
> complete General Release of any and all claims by Stephen
> Thomas Yelverton, individually, of any kind whatsoever,
> against Ms. Edmundson, Mr. Edmundson, Ms. Marm, Mr. Marm,
> their spouses and Yelverton Farms, and shall constitute
> a bar to any further litigation between these parties for
> any matter or claim that existed prior to the execution
> of this Settlement Agreement.

Exh. 1 to Dkt. No. 451 (emphasis added).[5]  Yelverton is constrained by the settlement agreement even though he was not a signatory because he was in privity with the signatories: the trustee succeeded to the debtor's interest in the bankruptcy estate when he was appointed as the trustee and he "[stood] in the shoes of the debtor" in negotiating the settlement.  *In re Salander*, 450 B.R. 37, 47 (Bankr. S.D.N.Y. 2011); *see also In re Collins*, 489 B.R. 917, 924 (Bankr. S.D. Ga. 2012).  The doctrine of release thus operates to bar the amended complaint.

The amended complaint is also barred by the doctrine of res judicata, specifically, claim preclusion.  Claim preclusion applies "if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." *Natural Res. Def. Council v. E.P.A.*, 513 F.3d 257, 260 (D.C. Cir. 2008) (quoting *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006)).  The court's order approving the settlement is a "final

---

[5]  The settlement agreement was filed with the court and is a publicly available record; therefore, the court may take judicial notice of it and may consider it when deciding a motion to dismiss under Rule 12(b)(6).  *See Asarco,* 765 F.3d at 1009 n.2 (internal citations omitted).

order entitled to "full res judicata effect."[6]  *See In re Gibraltar Res., Inc.*, 210 F.3d 573, 576 (5th Cir. 2000), *quoted in In re Salander*, 450 B.R. at 47.  A motion to approve a proposed settlement releasing claims against certain parties to the settlement brings before the court consideration of all of the claims that could be asserted against those parties, and requires any party seeking  disapproval of the settlement to point to any claims being released that have sufficient value to warrant such disapproval.  The approval of the settlement is an adjudication that there are no such claims having sufficient value to warrant disapproval of the settlement, and an adjudication that those claims being released may not be pursued.

Whether two proceedings are based on the same claim "turns on whether they share the same nucleus of facts." *Natural Res. Def. Council*, 513 F.3d at 261; *see also Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984).  Claim preclusion forecloses litigation of matters that were actually raised in an earlier suit as well as matters that could have been raised.  *Natural Res. Def. Council*, 513 F.3d at 261.  Therefore, Yelverton "cannot escape application of the doctrine by raising a different legal

---

[6]  Yelverton argues that the settlement agreement is not final because the settlement sum has not yet been paid to the trustee.  However, his focus is misplaced: it is the court's order approving the settlement which is imbued with the finality necessary, regardless of whether the settlement sum has been paid or whether the bankruptcy case is still pending.

theory or seeking a different remedy" in his amended complaint
that he could have asserted in a prior action. *Duma v. JPMorgan
Chase*, 828 F. Supp. 2d 83, 86-87 (D.D.C. 2011) (citing *Apotex,
Inc. v. F.D.A.*, 393 F.3d 210, 217 (D.C. Cir. 2004)).

As the amended complaint and the record in this case show,
there is a history of litigation between Yelverton and his
sisters, both in North Carolina and in this bankruptcy court.
Yelverton's amended complaint involves the same claims as those
raised in that prior litigation because it arises from the same
nucleus of facts, namely, the dispute over the ownership and
management of the family business and his sisters' activities
leading up to the settlement agreement.  The legal theories and
remedies in the amended complaint are newly asserted by
Yelverton; however, this is precisely what is barred by res
judicata.

Moreover, the facts alleged in his amended complaint were
already known to him at the time of the settlement hearing; he
had the opportunity to argue against the approval of the
settlement agreement on the basis that the settlement agreement
would preclude a suit against his sisters on the automatic stay
and RICO claims, or any other basis.  Yelverton could not have
sued Marm and Edmundson in the settlement approval hearing, it is
true, but he could have shown that approval of the release of
those claims against Marm and Edmundson ought not be approved.

40

Because he could have challenged (but did not challenge) the
release of his automatic stay and RICO claims, his amended
complaint is barred.

VI

Many of the claims in Yelverton's amended complaint are also
barred by issue preclusion (collateral estoppel).  "Issue
preclusion refers to the effect of a judgment in foreclosing
relitigation of a matter that has been litigated and decided.
This effect also is referred to as direct or collateral
estoppel." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465
U.S. 75, 77 n.1 (1984), *cited in Durkin v. Shields*, No.
92-1003-IEG, 1997 WL 808651, at *8-9 (S.D. Cal. June 5, 1997).
"An issue actually litigated and necessarily determined by a
court may not be relitigated in a suit on a different cause of
action involving a party to the previous litigation." *Durkin*,
1997 WL 808651, at *9.  For issue preclusion to apply,

> [1] the same issue now raised must have been contested by
> the parties and submitted for judicial determination in
> the prior case[; 2] the issue must have been actually and
> necessarily determined by a court of competent
> jurisdiction in that prior case[; and 3] preclusion in
> the second case must not work a basic unfairness to the
> party bound by the first determination.

*Martin v. Dep't of Justice*, 488 F.3d 446, 454 (D.C. Cir. 2007),
quoting *Yamaha Corp. of Amer. v. United States*, 961 F.2d 245, 254
(D.C. Cir. 1992).  Each of these elements applies here.

First, Yelverton contested at the hearing the issues he now

raises in his amended complaint.  He specifically argued at the
hearing and cross-examined the trustee regarding the following
arguments:

- the settlement sum was based on an incorrect
  undervaluing of the business, Hearing Tr. at 18-21,
  53-56, 83, 156, 205 (the same issue raised by predicate
  act 6 under his RICO claim);

- the defendants had asserted that Atkinson owed
  Yelverton's stock, Hearing Tr. at 107-108, 158-61,
  170-72 (the same issue raised by his "causes of action
  for violation of the automatic stay" in ¶ 178(b) & (c)
  of the amended complaint, and predicate acts 1-4 and 8
  under his RICO claim); and

- Edmundson had deliberately refused to renew the land
  lease in order to force down the settlement value,
  Hearing Tr. at 21-24, 56-58, 67-68, 138-40, 206-207
  (the same issue raised by predicate act 5 of his RICO
  claim).

Second, the above issues were actually and necessarily
determined by the bankruptcy court having jurisdiction to decide
the motion.  To approve the settlement, the bankruptcy court was
required to and did determine that the settlement agreement was a
reasonable one and necessarily rejecting any argument that the
settlement was being procured by fraud.  Hearing Tr. at 214-31.

The court also specifically found that the trustee had exercised
sound business judgment in negotiating and agreeing to the
settlement, necessarily rejecting any argument that the
settlement was based on fraudulent activity by the defendants.
*Id.*  The court also specifically discussed Edmundson's right not
to renew the land lease.  Hearing Tr. at 138-39.

Finally, preclusion in this adversary proceeding would not
work a basic unfairness to Yelverton.  A basic unfairness exists
if "the party to be bound lacked an incentive to litigate [the
issue] in the first [cause of action], especially in comparison
to the stakes of the second [cause of action]."  *Otherson v.*
*Dep't of Justice, I.N.S.*, 711 F.2d 267, 273 (D.C. Cir. 1983)
(citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402
U.S. 313, 333 (1971)).  Yelverton plainly had an incentive to
litigate fully against the motion to approve the settlement, as
is evidenced by his vigorous performance at the hearing and his
repeated attempts to undo the approval of that settlement.

Nevertheless, the plaintiff "must be permitted to
demonstrate, if he can, that he did not have a fair opportunity
procedurally, substantively, and evidentially to pursue his claim
the first time."  *Blonder-Tongue*, 402 U.S. at 333 (internal
quotation marks omitted).  Yelverton was permitted that
opportunity and has failed to show otherwise.  As the Court
explained in *Blonder-Tongue*, "a party who has had one fair and

full opportunity to prove a claim and has failed in that effort,

should not be permitted to go to trial on the merits of that

claim a second time.  Both orderliness and reasonable time saving

in judicial administration require that this be so unless some

overriding consideration of fairness to a litigant dictates a

different result in the circumstances of a particular case." *Id.*

at 324-25.  Yelverton cannot now mount a new challenge to the

reasonableness of the settlement collaterally by asserting that

he was injured by the settlement because it was the result of

fraudulent and unlawful conduct by the defendants.

VII

I turn now to the issue of whether I may treat this

proceeding as a core proceeding that statutorily I am authorized

to decide under 28 U.S.C. § 157(b)(1) or whether, instead,

Article III of the U.S. Constitution only permits me to issue a

proposed ruling for consideration by the district court.

Statutorily, the proceeding is a core proceeding because core

proceedings include "matters concerning the administration of the

estate." 28 U.S.C. § 157(b)(2)(A).  *Schultze v. Chandler (In re*

*Colusa Mushroom, Inc.)*, 765 F.3d 945, 948 (9th Cir. 2014).  This

proceeding concerns administration of the estate because it

includes allegations of violations of the automatic stay and RICO

violations resulting in a settlement in the bankruptcy case.

Constitutionally too the proceeding, at this juncture, should be

44

treated as a core proceeding.   Courts have concluded that a
bankruptcy court possesses statutory and constitutional authority
when a particular claim necessarily would have been resolved in a
bankruptcy proceeding, *see In re Frazin*, 732 F.3d 313, 319-20
(5th Cir. 2013), and, here, the propriety of the settlement and
the parties' pursuit thereof was determined when the court
approved the settlement.

    In addition, the dismissal of this proceeding for lack of
standing based on the Bankruptcy Code provision vesting authority
to sue in the trustee is an adjudication arising under the
Bankruptcy Code and thus a core proceeding.   Like a dismissal for
lack of subject matter jurisdiction, there is no reason to decide
whether the claims, if *not* dismissed based on lack of standing,
would present a core or non-core proceeding.   A dismissal for
either lack of standing based on a Bankruptcy Code provision or
for lack of subject matter jurisdiction necessarily will be
reviewed *de novo* on appeal, and Congress could constitutionally
vest authority in the bankruptcy court to decide such questions
in the first instance.

    Moreover, under 11 U.S.C. § 105, a bankruptcy court has
broad power to implement the provisions of the Bankruptcy Code
and to prevent an abuse of the bankruptcy process.   *See Walton v.
LaBarge (In re Clark)*, 223 F.3d 859, 864 (8th Cir. 2000); *In re
Volpert*, 110 F.3d 494, 500 (7th Cir. 1997); *Jones v. Bank of*

*Santa Fe (In re Courtesy Inns, Ltd., Inc.)*, 40 F.3d 1084, 1089
(10th Cir. 1994). Yelverton has engaged in a series of frivolous
litigation in this and the district court, and this is yet
another instance. An order dismissing this adversary proceeding
does not offend Article III of the Constitution because it
amounts in effect to an order, as authorized by 11 U.S.C. § 105,
barring the pursuit of Yelverton's meritless and vexatious
claims, subject to review of the order by way of appeal.

Congress intended that bankruptcy courts, to the maximum
extent constitutionally permissible, be allowed to hear and
decide proceedings, subject to review by way of appeal. Allowing
a Rule 12(b)(6) dismissal of this type of frivolous and vexatious
proceeding (attacking parties who entered into a settlement with
a trustee) to be treated as a core proceeding advances that
Congressional goal. I will treat this proceeding, in its present
posture of requiring a determination of whether Rule 12(b)(6)
bars the proceeding, as both statutorily and constitutionally a
core proceeding.

However, the issue is largely academic because review on
appeal by the district court of the Rule 12(b)(6) dismissal
order, a review of a question of law, will be *de novo* just as
would be review under 28 U.S.C. § 157(c)(1) of proposed findings
of fact and conclusions of law recommending dismissal under Rule
12(b)(6). *De novo* review by way of appeal will accord Yelverton

46

all of the Article III review to which he is entitled. *See*
*Schultze*, 765 F.3d at 948 n.1.

When treating a statutory core proceeding as a core
proceeding is constitutionally invalid, a bankruptcy court may
nevertheless treat the proceeding as non-core and issue proposed
findings of fact and conclusions of law under 28 U.S.C.
§ 157(c)(1). *Exec. Benefits Ins. Agency v. Arkison (In re*
*Bellingham Ins. Agency, Inc.)*, 134 S. Ct. 2165, 2174 (2014). If
Article III of the Constitution barred my adjudicating the Rule
12(b)(6) motion, this ruling shall constitute my proposed
findings of fact and conclusions of law under 28 U.S.C.
§ 157(c)(1). If the district court agrees that Rule 12(b)(6)
requires dismissal of the proceeding, the district court need not
decide the Article III question because it can enter a judgment
decreeing that (1) the judgment of dismissal is affirmed if the
bankruptcy court had authority to dismiss the proceeding, and, in
the alternative, (2) the proceeding is dismissed if the

bankruptcy court was not authorized to decide the proceeding.[7]

VIII

Finally, Yelverton has filed a motion in this Adversary Proceeding (Dkt. No. 25) to certify this as a class action on behalf of all creditors and to amend the amended complaint to bring class allegations.  That motion must be denied.  Because the amended complaint fails to state a claim upon which relief can be granted, there is no point in making such a certification. Moreover, Yelverton is not an attorney who is a member of the bar of the district court of which this court is a unit under 28 U.S.C. § 151 and thus he is not authorized to represent any such creditors in this adversary proceeding.

---

[7]  For example, the district court's judgment in *First American Title Ins. Co. v. Stevenson (In re Stevenson)*, Case No. 1:13-cv-00440-RJL (D.D.C. Mar. 21, 2014) (Dkt. No. 7), directed that it is:

> ORDERED that the bankruptcy court's Judgment . . . is affirmed (and, in the alternative, if the claims that judgment adjudicated were required to be decided by this court de novo, the bankruptcy court's rulings and its judgment regarding those claims are adopted as the rulings and judgment of this court regarding those claims effective as of the date of this judgment).

*See also First American Title Ins. Co. v. Stevenson (In re Stevenson)*, --- B.R. ---, 2014 WL 1125353, at *1 n.4 (D.D.C. Mar. 20, 2014) (Even if the bankruptcy court erred in treating the matter as a core proceeding, "the only practical consequence is that I would be required to treat its judgment as a recommendation and review its factual findings de novo.  28 U.S.C. § 157(c)(1).  Because my view of the record comports with the Bankruptcy Court's, I would adopt its findings and accept its recommendations in full.").

IX

A judgment follows granting the defendants' motion to dismiss; denying Yelverton's motion for class certification and to amend the amended complaint; dismissing this adversary proceeding in its entirety; and directing that if the bankruptcy court was not authorized to decide the motion to dismiss, this decision constitutes the bankruptcy court's proposed findings of fact and conclusions of law under 28 U.S.C. § 157(c)(1).

[Signed and dated above.]

Copies to: All counsel of record.